## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

————————————————————
                                        )
**CSX TRANSPORTATION, INC.,**           )
                                        )
    **Plaintiff,**              )         **Civil Action No.**
                                        )         **06-40211-FDS**
    **v.**                      )
                                        )
**MASSACHUSETTS BAY**                    )
**TRANSPORTATION  AUTHORITY,**          )
                                        )
    **Defendant.**              )
————————————————————)

## MEMORANDUM AND ORDER
## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

**SAYLOR, J.**

This is a declaratory judgment action arising out of an indemnification agreement between plaintiff CSX Transportation, Inc., and defendant Massachusetts Bay Transportation Authority ("MBTA"). Jurisdiction is based on diversity of citizenship.

The underlying claim arises out of a tragic accident at the Wellesley Farms, Massachusetts, commuter rail station in December 2003. During a heavy snowstorm, Robert McTague was removing snow from the railroad tracks when he was struck and killed by a CSX freight train. At the time, McTague was employed by Massachusetts Bay Commuter Railroad, LLC ("MBCR"), which operated MBTA's commuter rail services under an operating contract.

CSX is a defendant in a wrongful death action brought by McTague's estate in Massachusetts state court. CSX contends that under the terms of the agreement the MBTA is obliged to defend and indemnify it in the state-court action. CSX filed a four-count complaint seeking a declaratory judgment as to its right to indemnification from the MBTA on theories of

express indemnity, implied indemnity, and common-law indemnity.

The parties have filed cross-motions for summary judgment. The MBTA seeks summary judgment on the claim for express indemnification. It argues that CSX spoliated evidence in the state-court action, thereby materially prejudicing the MBTA's rights. The MBTA contends that any contractual indemnification obligation was thereby extinguished as a matter of law. In the alternative, it asks to be allowed to raise spoliation as a defense at trial. Finally, it seeks a ruling that the indemnification agreement violates Massachusetts public policy to the extent the MBTA is obligated to indemnify CSX against liability arising from grossly negligent, reckless, willful, or wanton conduct.

CSX has moved for summary judgment on all counts of the complaint. CSX contends that it is entitled to express indemnification under the plain language of the relevant contract, and that the potential for a finding of gross negligence, or reckless, willful, or wanton conduct does not alter MBTA's duty to defend and indemnify. It argues that Massachusetts does not have a public policy precluding indemnification agreements covering such aggravated wrongdoing, and that if such a policy exists, it is preempted by federal law. Finally, CSX contends that it is entitled to implied and common-law indemnification.

For the reasons set forth below, the Court will grant both motions in part and deny both in part.

I.      **Factual Background**

A.      **The Agreement**

The MBTA is a political subdivision of the Commonwealth of Massachusetts. It is responsible for providing public transportation services in the Boston area. In 1985, Consolidated

Rail Corporation ("Conrail") owned the railroad line from Boston to Worcester, which runs

through Wellesley and Framingham and is used for both freight and passenger service.  Conrail

and the MBTA entered into a Trackage Rights Agreement ("TRA") governing operation of

various shared railroad tracks, including the line through Wellesley.  The TRA granted each party

rights to provide services on property that the parties separately owned or controlled and defined

their respective obligations.

Article 7 of the agreement sets forth the parties' indemnity obligations with respect to

accidents that occur during the provision of services required by the agreement.  Section 7.03 of

the TRA states in relevant part:

> MBTA shall defend, indemnify, and save harmless CONRAIL and CONRAIL
> Employees, irrespective of any negligence or fault of, or control by, same, or
> howsoever the same shall occur or be caused, from any and all liability, damage, or
> expense of any kind whatsoever, including reasonable attorneys fees, arising out of
> injury to or death of any MBTA Employee or other contractor of MBTA, or
> arising out of loss of, damage to, or destruction of any property of any such
> MBTA Employee or contractor.  MBTA Employees who are involved in MBTA's
> provision of services to CONRAIL under this Agreement shall be regarded as
> MBTA Employees and not as employees of CONRAIL.[1]

(Compl., Ex. A at 5).  Under Section 7.01, "MBTA Employees" are defined as "the employees

and agents of MBTA, and MBTA's operating contractors and said contractors' employees."  (*Id.*

at 4).

In addition, Section 7.07 of the TRA states:

> Except as otherwise provided in Section 7.01 through 7.06, of this
> ARTICLE 7:

>> (a)  CONRAIL shall defend, indemnify, and save harmless MBTA and

---

[1] Section 7.02 imposes parallel indemnification obligations on Conrail regarding "injury to or death of
any CONRAIL Employee or other contractor of CONRAIL."  (Compl. Ex. A, at 5).

3

MBTA Employees from any and all liability, damage, or expense of any kind whatsoever, including reasonably attorneys fees, arising out of injury to or death of any Person, or arising out of loss of, damage to, or destruction of any property of any Person, resulting from the negligence or fault of CONRAIL, CONRAIL Employees or other contractors of CONRAIL (other than MBTA).

(b)  MBTA shall defend, indemnify, and save harmless CONRAIL and CONRAIL Employees from any and all liability, damage, or expense of any kind whatsoever, including reasonably attorneys fees, arising out of injury to or death of any Person, or arising out of loss of, damage to, or destruction of any property of any Person, resulting from the negligence or fault of MBTA, MBTA Employees or other contractors of MBTA (other than CONRAIL).

(c)  If liability, damage or expense of any kind whatsoever arises as a result of the negligence or fault of both parties, or their respective Employees or other contractors, the obligations of the parties to indemnify each other pursuant to Sections 7.07(a) and 7.07(b), above, shall be apportioned on the same basis as would arise under applicable common law and statutory principles of law concerning tort liability, contribution and indemnification, provided, that for the purposes of this contractual provision insofar as it relates to the right to contribution of one party to another, and notwithstanding any contrary principle of law, the party against whom contribution is sought shall be responsible for the negligence or fault of its Employees or other contractors.

(*Id.* at 8-9).  Under Section 7.01, "Person" is defined as "any person, including, without limitation, passengers and third parties, as well as the respective employees, agents or contractors of the parties."  (*Id.* at 4).

In June 1999, CSX purchased certain Conrail assets and became Conrail's successor-in-interest with respect to the MBTA agreement.

Since July 2003, the MBCR has provided the MBTA's commuter rail services pursuant to an operating contract.  The MBTA admits that MBCR is an "operating contractor" as that term is used in Section 7.03.  (Def. Opp. at 17-18).

### B.   The McTague Accident and Ensuing Lawsuit

On December 6, 2003, Robert McTague, an employee of MBCR, was helping to clear

snow from the railroad tracks at the Wellesley Farms commuter rail station during a storm.  A CSX freight train passed through the station, striking and killing Mr. McTague.

The tracks on which Mr. McTague was working belonged to CSX, but MBCR had not informed CSX that its crew would be clearing snow at the station.  As a result, the CSX dispatcher gave a "clear signal" to the CSX train all the way from Framingham to Boston. Among other things, this meant that the train's engineer believed the tracks between Framingham and Boston would be free from any work crews.

In October 2006, the administrator of the McTague estate filed a lawsuit in Massachusetts Superior Court against CSX and MBCR for, among other things, damages for wrongful death. The MBTA was not named as a party in the lawsuit.  CSX denied that it was negligent.  Instead, it contended that Mr. McTague's death was caused by his trespassing on CSX's railroad tracks in violation of standard railroad workers' practices and the rules and regulations governing working on or around active railroad tracks.  Among other alleged violations, CSX argued that MBCR failed to obtain "foul time" for Mr. McTague, which would have resulted in the track being closed to railroad traffic while the crew was working.  CSX also filed cross-claims against MBCR for contribution, implied indemnification, and common-law indemnification.

In October 2008, MBCR settled with the McTague estate and was dismissed from the case.  CSX thereafter voluntarily dismissed its cross-claims against MBCR.  The McTague estate's direct claims against CSX remain pending in state court.

### C.    <u>The Spoliation Issue</u>

Some four years into discovery in the state-court action, MBCR filed a motion to dismiss CSX's cross-claims as a sanction for alleged discovery violations.  (Def. Mot. for Summ. J., Ex.

5-A, at 2-21).  MBCR contended that CSX tampered with "the most critical evidence in the

case—the train's event recorder[—]destroyed documents, and thereby perpetrated a fraud on the

Court."  (*Id.* at 2-3).[2]  MBCR claimed that CSX manipulated the event recorder to make it appear

that the train was traveling at a slower rate of speed at the time it struck and killed Mr. McTague.

(*Id.* at 3).[3]  Specifically, MBCR noted a discrepancy in CSX's records between the measurements

of the locomotive's wheel sizes taken after the accident—39.00" and 39.75".  (*Id.* at 3).  Because

data from the event recorder is combined with such measurements in order to calculate the train's

speed, the two different measurements resulted in two different calculations of the train's speed.

(*Id.* at 3 & n.2).  MBCR contended that CSX falsified the measurement of the locomotive's wheel

size to make it appear smaller, thereby producing a slower speed calculation.  (*Id.* at 3).  It asked

the state court to dismiss CSX's cross-claims as a sanction and to order CSX to pay attorneys'

fees and expenses.  (*Id.* at 4-5).

CSX opposed the motion, arguing that it did not tamper with or spoliate evidence and that

MBCR's requested sanctions were inappropriate under the circumstances.  (Def. St. of Mat.

Facts, Ex. 5-B(a)(i), at 2).  CSX first contended that the event recorder was not the most critical

piece of evidence in the case.  (*Id.* at 2-3).  CSX noted that even if the freight train had been

traveling a few miles per hour faster than the event recorder data indicated, it was still traveling

significantly slower than the maximum speed of 60 miles per hour authorized for passenger trains

---

[2] As noted by MBCR, "The event recorder is similar to the 'black box' of an airplane.  Event recorders
preserve various data with respect to a locomotive's operations, including speed, distance traveled, location, and
use of the horn, bell, and brakes."  (Def. Mot. for Summ. J., Ex. 5-A, at 2 n.1).

[3] Data from the event recorder is combined with measurements of the locomotive's wheel size in order to
calculate the train's speed.  (Def. Mot. for Summ. J., Ex. 5-A, at 3 n.2).  The larger wheel size, the faster the
speed; the smaller the wheel size, the slower the speed.  (*Id.*).

on that portion of the tracks.  (*Id.* at 3 & n.2).  CSX therefore argued that the speed of its train

was essentially irrelevant.  (*Id.* at 3).  Although it admitted that there was a discrepancy in the

wheel size measurements that resulted in two different speed calculations, CSX contended that it

did not destroy or tamper with the event recorder.  (*Id.* at 12).  CSX noted that an employee

manually measured the wheels after the accident, and that those measurements are not a

component of the data stored on the event recorder.  (*Id.* at 9-10).  According to CSX, any

discrepancy in those measurements was inadvertent and not the result of bad faith.  (*Id.* at 13-14).

The Superior Court heard the motion at a hearing on March 11, 2009.  (Def. St. of Mat.

Facts, Ex. 5-D(a), (b)).  The court rejected MBCR's request that it dismiss the cross-claims or

otherwise sanction CSX.  (*Id.* Ex. 5-D(b), at 16).  Instead, the court made what it characterized

as a "trial ruling" that the parties would be free at trial to highlight the wheel size discrepancy and

related history for the jury's consideration.  (*Id.* at 13).  Likening the discrepancy to a prior

inconsistent statement, the court ruled that the jury would be free to consider whether CSX had

made a calculated effort hide the true size of the wheels.  (*Id.* at 13-14).  The court, however,

stated that it was "unable to conclude that what occurred was a calculated, intentional effort to

mislead," and it specifically rejected MBCR's contention that CSX had spoliated evidence or

committed a fraud on the court.  (*Id.* at 17).

**D.**     **Procedural History**

On October 3, 2006, CSX filed a four-count complaint in this Court seeking a declaratory

judgment as to its right to indemnification from the MBTA.  The complaint alleged theories of

express indemnity, implied indemnity, and common-law indemnity.  The Court denied the

MBTA's request that it stay the case pending resolution of the state-court wrongful death action,

and the ordered the parties to proceed toward disposition.  The parities have now filed cross-motions for summary judgment.  The MBTA seeks partial summary judgment, contending that it is entitled to judgment on CSX's claim for express indemnification (Count II).  CSX has moved for summary judgment in its entirety, arguing that it is entitled to express, implied, and common-law indemnification.

## II.     Standard of Review

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "Essentially, Rule 56(c) mandates the entry of summary judgment 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'"  *Coll v. PB Diagnostic Sys.*, 50 F.3d 1115, 1121 (1st Cir. 1995) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  In making this determination, the Court views "the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor."  *Noonan v. Staples, Inc.*, 556 F.3d 20, 25 (1st Cir. 2009).

## III.    Analysis

### A.      Spoliation

The MBTA contends it is entitled to summary judgment on Count II of the complaint (for express indemnification) because CSX spoliated evidence in the underlying state-court action, thereby prejudicing the rights of the MBTA as indemnitor.  "It is well established that any act on the part of an indemnitee which materially increases the risk, or prejudices the rights of the indemnitor, will discharge the indemnitor under a contract of indemnification ."  *Unisys Corp. v.*

8

*Legal Counsel, Inc.*, 768 F. Supp. 6, 8 (D.D.C. 1991).  According to the MBTA, CSX engaged in discovery misconduct by altering data relating to the wheel size measurements.  The MBTA argues that evidence of this tampering will be presented to the state-court jury with the likely result that CSX will be punished for its misconduct.  If CSX is punished by the jury, the MBTA argues, it will materially increase the MBTA's indemnification obligation.  The MBTA therefore contends that its indemnification obligation should be discharged.  (Def. Mem. at 10-15).

CSX denies the MBTA's allegations of spoliation and tampering.  While admitting that there is a discrepancy in the wheel size measurements—which, it notes, are not components of the data stored on the event recorder—CSX responds that the discrepancy was inadvertent and not intentionally misleading.  CSX maintains that it complied with all relevant state court orders relative to discovery and that the MBTA has suffered no prejudice.  Finally, CSX argues that the relief requested by the MBTA is precluded by the state judge's 2009 ruling the discovery controversy.  (Pl. Opp. at 15-29).

The Court is disinclined, to say the least, to second-guess the state judge's judgment that CSX did not spoliate evidence or commit a fraud in the state-court action.  After a thorough hearing and examination of the evidence, the state court concluded that CSX had not acted in bad faith during discovery in the McTague wrongful death action.  (Def. St. of Mat. Facts, Ex. 5-D(a), (b)).  That decision is entitled to considerable deference by this Court, both as a matter of comity and practicality.  *Cf. Lundborg v. Phoenix Leasing, Inc.*, 91 F.3d 265, 272 (1st Cir. 1996) ("This preference is not merely a matter of comity but also reflects practical considerations:  here, the . . . state court has the advantage over all other courts . . . in deciding whether fraud occurred in its own prior proceedings.").  Were this Court to conclude that CSX had spoliated evidence, it

9

would at the very least call into question the correctness of the state court's contrary decision. But the MBTA has done little more than file in this Court repackaged versions of the motions and exhibits it previously filed in the state court.  (*Compare* Def. Mem. at 6-15, *with* Exs. 4-6).  That is not sufficient to convince the Court that the state court's ruling should be denied recognition. Moreover, "the [Massachusetts] state court is obviously the forum that can most readily determine whether . . . fraud occurred in its own prior proceedings," in part because that court has "superior knowledge of how its proceedings are customarily conducted."  *Lundborg*, 91 F.3d at 273.

In any event, the Court is not persuaded that CSX's conduct in the state-court action "materially increases the risk, or prejudices the rights of the [MBTA]."  *Unisys Corp.*, 768 F. Supp. at 8.  As the state judge concluded at the hearing on the MBTA's motion for sanctions, the discrepancy in the wheel size measurements is, "at a minimum, . . . entirely analogous to a prior inconsistent statement and should be the sort of thing that appears before a jury."  (Def. St. of Mat. Facts, Ex. 5-D(b), at 14).  The Court elaborated:

> I think it's like testifying at a deposition, and there are cases like this, too, in our law, both federal and state, which say that if you say the light is red at a deposition, you can't later on say it was green.  At a minimum, the fact finder's entitled to know you've said both red and green.

(*Id.* at 15).  There is no clear reason to disagree with that conclusion.  Indeed, beyond the wheel size discrepancy itself, the MBTA does not appear to have sufficient evidence of bad faith on the part of CSX.  And it is entirely speculative whether a jury might punish CSX, and therefore the MBTA, because of CSX's conduct.  Accordingly, the Court concludes as a matter of law that the MBTA's indemnification obligation is not discharged by CSX's conduct in the underlying state-

court case.  The MBTA's motion for partial summary judgment on Count II will therefore be denied.

### B.        Express Indemnification (Count II)

Having concluded that the MBTA has failed to raise a genuine issue of material fact as to spoliation, the Court will next consider the language of the TRA.

CSX contends that it is entitled to summary judgment on its claim for express indemnification.  (Pl. Mem. at 16-19).  Specifically, CSX contends that under the TRA, the MBTA has both a duty to defend and a duty to indemnify CSX in the underlying state-court action.  (*Id.* at 17).  According to CSX, the duty to defend is broader than the duty to indemnify, and it arises simply as a result of the allegations made in the state-court complaint.  (*Id.*).  CSX contends that it is immaterial whether the allegations in the state-court action are ultimately substantiated at trial; rather, the potential for indemnification alone is sufficient to trigger the duty to defend.  (*Id.* at 17-18).  As to indemnification, CSX argues that the language of the TRA clearly and unambiguously obligates the MBTA to indemnify it in the state-court proceedings.  (*Id.* at 18-19).

In response, the MBTA disputes that the indemnification provision of the TRA is clear.  (Def. Opp. Mem. at 14-21).  According to the MBTA, the language of the TRA is inconsistent and ambiguous, and summary judgment is therefore improper absent extrinsic evidence indicating that the parties intended the MBTA to indemnify CSX.  (*Id.* at 20).  The MBTA has not responded to CSX's argument regarding the duty to defend.  (*See id.* at 14-21; Pl. Reply Mem. at 19-20).

Ordinary principles of contract law govern the Court's interpretation of the TRA.  *Speers*

*v. H.P. Hood, Inc.*, 22 Mass. App. Ct. 598, 600 (1986) ("[A]n indemnity provision is . . . is to be interpreted like any ordinary contract. . . ." (footnote omitted)).  If the agreement is unambiguous, the Court must interpret it in accordance with its ordinary and plain meaning.  *See Citation Ins. Co. v. Gomez*, 426 Mass. 379, 381 (1998).  An agreement is not ambiguous merely because "a controversy exists between the parties, each favoring an interpretation contrary to the other," or because a word has multiple dictionary definitions.  *Id.*  Rather, a contract provision is ambiguous "only if it is susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one."  *Id.; see also Kelly v. Dimeo*, 31 Mass. App. Ct. 626, 629 (1991).  The determination of whether a contract is unambiguous is a question of law for the Court.  *Bank v. Thermo Elemental Inc.*, 451 Mass. 638, 648 (2008).

### 1.      The Duty to Defend

CSX first argues that the TRA obligates the MBTA to defend it in the state-court wrongful death action.  To date, the MBTA has refused to do so, resulting in CSX incurring attorneys' fees and expenses it should have avoided under the terms of the parties' contract.  The MBTA offers no response to this argument—nor could it, as the law is settled and clear.  CSX is entitled to declaration that the MBTA has a duty to defend.

The duty to defend is broader than the duty to indemnify.  *A.W. Chesterton Co. v. Mass. Ins. Insolvency Fund*, 445 Mass. 502, 527 (2005).  As the SJC has explained in the insurance context:

> There is a meaningful difference between an insurer's duty to defend (and an insured's reliance on that duty) and a duty to indemnify.  The duty to defend arises in situations involving threatened or actual litigation by a third party, a context in which time is of the essence, and in which cost and complexity can compound each passing day.

12

*Wilkinson v. Citation Ins. Co.*, 447 Mass. 663, 671 (2006).  The duty is triggered by the allegations made in the third-party complaint, *Liberty Mut. Ins. Co. v. SCA Servs., Inc.*, 412 Mass. 330, 332 (1992), and "arises if, in comparing the [contract] terms with the third-party complaint, . . . the allegations of the complaint are reasonably susceptible of an interpretation that they state or adumbrate a claim covered by the [contract] terms."  *Simplex Techs., Inc. v. Liberty Mut. Ins. Co.*, 429 Mass. 196, 197-98 (1999) (quotations and alteration omitted).

Here, there is no question that under the terms of the agreement, the MBTA has a duty to defend.  Section 7.03 provides that the "MBTA shall defend . . . [CSX] and [CSX Employees], irrespective of any negligence or fault . . ., from any and all liability, damage, or expense of any kind whatsoever, including reasonable attorneys fees, arising out of injury to or death of any MBTA Employee or other contractor of MBTA."  (Compl. Ex. A, at 5).  For its part, the state-court complaint alleges that CSX "negligently . . . operated, managed or controlled a freight train," and that CSX negligently caused the death of Mr. McTague, who was an "MBTA Employee" within the meaning of the TRA.[4]  (Pl. Mem., Ex. FF, at 18, 20, 21).  The allegations of the complaint are reasonably susceptible of an interpretation that states a claim falling within the terms of the TRA, and the MBTA therefore has a duty to defend CSX in the underlying wrongful death action.

---

[4] Section 7.0 defines "MBTA Employees" as "employees and agents of MBTA, and MBTA's operating contractors and said contractors' employees."  (*Id.* at 4).  Thus, because Mr. McTague was an employee of the MBCR at the time of the accident, and because the MBCR is an operating contractor of the MBTA, Mr. McTague is an "MBTA Employee" as that term is used in the agreement.

## 2. <u>The Duty to Indemnify</u>

CSX next argues that under the unambiguous and plain language of the TRA it is entitled

to indemnification from the MBTA in the underlying state action.  (Pl. Mem. at 16-19).  In

response, the MBTA attempts to find ambiguity by highlighting what it contends are various

inconsistencies in Article 7 of the agreement.  (Def. Opp. at 14-21).  As explained below, the

Court concludes that the TRA is unambiguous and that it requires the MBTA to indemnify CSX

in the McTague wrongful death action.

As with the duty to defend, Article 7 of the TRA plainly and unambiguously requires the

MBTA to indemnify CSX.  Section 7.03 of the TRA provides that the "MBTA shall defend,

indemnify, and save harmless [CSX] and [CSX] Employees, irrespective of any negligence or fault

. . . , from any and all liability . . . arising out of injury to or death of any *MBTA Employee* or

other contractor of MBTA."  (Compl. Ex. A, at 5 (emphasis added)).  Because Mr. McTague was

an "MBTA Employee," the MBTA is required to indemnify CSX, irrespective of any negligence

or fault, from all liability for his death.

In the face of this straightforward application of the agreement, the MBTA contends there

are two inconsistencies in the language of the TRA that lead to ambiguity.  First, the MBTA notes

that in defining "MBTA Employees," Section 7.01 uses the phrase, "MBTA's *operating*

*contractors* and said contractors' employees."  By contrast, Section 7.03 provides that the MBTA

shall indemnify CSX against liability arising from injury or death of any "MBTA Employee *or*

*other contractor* of the MBTA."  Reading these provisions together, the MBTA labors to explain

what it claims is an inconsistency in the agreement's use of the term "contractor."  (Def. Opp. at

16-18).

That contention is without merit.  The two provisions are complementary, not contradictory, and are easily harmonized.  Because Section 7.01 defines "MBTA Employees" as including its "operating contractors," Section 7.03 uses the term "other contractors" to distinguish the latter type of contractor from the former.  The latter are by definition "MBTA Employees"; the former are not.  But death or injury to either requires the MBTA to indemnify CSX.

The MBTA next contends there is an inconsistency between Sections 7.03 and 7.07 of the agreement.  Section 7.07 requires CSX to indemnify the MBTA against liability arising from death or injury to "any Person . . . resulting from the negligence or fault of [CSX], [CSX] Employees or other contractors of [CSX] (other than MBTA)."  (Compl. Ex. A, at 9).  Section 7.01 defines "Person" as "any person, including, without limitation, passengers and third parties, *as well as the respective employees, agents or contractors of the parties*."  (*Id.* at 4 (emphasis added)).  According to the MBTA, if Mr. McTague is an "MBTA Employee" as that term is used in Section 7.03, he is also a "Person" as that term is used in Section 7.07.  As a result, the MBTA contends that there is an irreconcilable conflict between Section 7.03 and Section 7.07:  the former obligates the MBTA to indemnify CSX (because Mr. McTague is an "MBTA Employee") while the latter requires CSX indemnify the MBTA (because Mr. McTague is a "Person").  (Def. Opp. at 18-21).

While the MBTA's argument has some superficial appeal, it is unpersuasive.  Section 7.07 is titled "Other Apportionment of Liability" and is written as a catch-all provision.  This is confirmed by the first phrase of the section, which provides:  "Except as otherwise provided in Section 7.01 through 7.06, of this ARTICLE 7."  (Compl. Ex. A, at 8).  Section 7.07 therefore

15

makes clear that it is a general provision designed to apply only when a specific provision of Article 7 otherwise does not.  *See Bank v. IBM Corp.*, 145 F.3d 420, 427 (1st Cir. 1998) (noting "the longstanding principle of contract interpretation that specific terms are given greater weight than general language" (quotation and alteration omitted)).  As explained above, the specific and unambiguous language in Section 7.03 applies in this case—Mr. McTague is an "MBTA Employee" under that provision and, as a result, the MBTA must indemnify CSX for his death. Because the specific language of Section 7.03 applies, it trumps the general language contained in Section 7.07, and there is no inconsistency.[5]

For these reasons, the Court concludes that the TRA unambiguously requires the MBTA to indemnify CSX in the underlying state-court action.  CSX is therefore entitled to summary judgment on Count II of its complaint (express indemnification).

## C.    Implied Indemnification (Count III)

CSX also argues that it is entitled to indemnification based upon an implied agreement that the MBTA would indemnify CSX.  It is well-established, however, that "[t]he law will not imply a contract where there is an existing express contract covering the same subject matter."  *Zarum v. Brass Mill Materials Corp.*, 334 Mass. 81, 85 (1956).  Although the parties disagree as to the proper interpretation of Section 7.03 of the TRA, they do not dispute that it expressly governs any indemnification agreement that may exist.  The Court, therefore, will not imply an indemnification obligation that the parties did not include in their agreement, and CSX's motion

---

[5] The MBTA attempts to avoid the effect of Section 7.07's disclaimer by pointing to similar language in Section 7.01, the definitional section, which provides that "[f]or the purpose of this Article 7, the following terms shall have the meanings provided below *unless otherwise expressly provided* in this Article."  (*See* Def. Opp. at 18 n.8 (quoting TRA § 7.01(b), Compl. Ex. A, at 4 (emphasis added))).  This language is of no help to the MBTA, however, because Section 7.01"otherwise expressly provide[s]" that Mr. McTague is an "MBTA Employee" and not a "Person" as those terms are used in Article 7.

for summary judgment on Count III of its complaint (implied indemnification) will be denied.

**D.      Common-Law Indemnification (Count IV)**

CSX next contends that it is entitled to indemnification under a common-law theory.  The general rule is that "a person who negligently causes injury to a third person is not entitled to indemnification from another person who also negligently caused that injury." *Rathbun v. W. Mass. Elec. Co.*, 395 Mass. 361, 364 (1985).  An exception exists, however, "where the person seeking indemnification did not join in the negligent act of another but was exposed to liability because of that negligent act."  *Id.*  In such a case, common-law principles shift the loss upon the more guilty of the two tortfeasors.  *Araujo v. Woods Hole, Martha's Vineyard, Nantucket S.S. Auth.*, 693 F.2d 1, 3 (1st Cir. 1982).  Common-law indemnification is available "only when the party seeking it was merely passively negligent while the would-be indemnitor was actively at fault."  *Id.*

As with the claim for implied indemnification, the Court concludes that CSX is not entitled to common-law indemnification.  Article 7 of the TRA expressly and comprehensively defines the parties' indemnification obligations.  Section 7.03 in particular is directly applicable, because the case involves the death of an "MBTA Employee" as that term is used in Article 7.  The fact that the contract exhaustively details the parties' indemnification responsibilities strongly suggests that CSX and the MBTA intended Article 7 of the TRA to be the exclusive arrangement under which one party would be obligated to indemnify the other.  In other words, the parties intended the TRA to supplant the common law to the extent the a specific provision of Article 7 applies.  *See HRPT Advisors, Inc. v. MacDonald, Levine, Jenkins & Co.*, 43 Mass. App. Ct. 613, 624 n.15 (1997) ("By their . . . contract, of course, the [parties] were free to alter the result required under

17

the common law.").  Were this not the case, much of Article 7 would be meaningless, because a

party could seek indemnification under common-law principles even if it was not entitled the

indemnification under the express and specific terms of the agreement.  *See  Lexington Ins. Co. v.*

*All Regions Chemical Labs, Inc.*, 419 Mass. 712, 713 (1995) ("A contract should be construed in

such a way that no word or phrase is made meaningless.").

      Section 7.07(c) of the TRA confirms the conclusion that Section 7.03 is the exclusive

basis on which the MBTA can be required to indemnify CSX in this case.  It provides:

> If liability, damage or expense of any kind whatsoever arises as a result of the
> neglige or fault of both parties, or their respective Employees or other contractors,
> the obligations of the parties to indemnify each other pursuant to Sections 7.07(a)
> and 7.07(b), above, *shall be apportioned on the same basis as would arise under*
> *applicable common law and statutory principles of law concerning tort liability,*
> *contribution and indemnification.*

(Compl., Ex. A, at 9 (emphasis added)).  This provision plainly preserves common-law

indemnification principles in those cases where Sections 7.07(a) and 7.07(b) apply.  But as

explained above, the specific language in Section 7.03 applies to this case and trumps the general

language in Section 7.07.  (*See* TRA Section 7.07, Compl. Ex. A, at 8 ("Except as otherwise

provided in Section 7.01 through 7.06, of this ARTICLE 7.")).  Thus, because the parties

expressly preserved the common-law in cases where Section 7.07 applies, it is clear they intended

to supersede it when Section 7.03 applies, as it does here.  *See Higginson v. Weld*, 80 Mass. 165,

172 (1859) ("*Expressio unius est exclusio alterius*, is a maxim which applies as forcibly to the

exceptions to an obligation as to the enumeration of the objects to which the contract applies.").

CSX, therefore, is not entitled to common-law indemnification, and its motion for summary

judgment as to Count IV of its complaint will be denied.

E.   **Grossly Negligent, Reckless, Willful, and Wanton Conduct**

The MBTA contends that to the extent the TRA obligates it to indemnify CSX against liability arising from CSX's grossly negligent, reckless, willful, or wanton conduct, the agreement is void as against public policy.  (Def. Mem. at 16-20).  CSX acknowledges that Massachusetts courts have sometimes refused to enforce releases or waivers of grossly negligent conduct.  (Pl. Mem. at 20-26).[6]  Even so, CSX contends that these cases are inapplicable to indemnification agreements, which do not deprive plaintiffs of recovery but merely shift the source of compensation.  (*Id.* at 21-26).

Federal courts sitting in diversity must follow the decisions of the state's highest court.[7] *Janney Montgomery Scott LLC v. Tobin*, 571 F.3d 162, 164 (1st Cir. 2009).  "Where no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do."  *Wade v. EMCASCO Ins. Co.*, 483 F.3d 657, 666 (10th Cir. 2007).  In such a situation, the court should make its own best guess as to state law.  *Liberty Mut. Ins. Co. v. Metro. Life Ins. Co.*, 260 F.3d 54, 65 (1st Cir. 2001).  Decisions of the state's intermediate appellate courts are helpful, but not controlling.  *See id.* at 64-65.

On the issue presently before the Court—whether a party may obtain indemnification against its own gross negligence—there is no controlling decision from the Supreme Judicial Court.  Nor is there a decision on point from the Massachusetts Appeals Court.  In the absence of such guidance, it is the Court's obligation to predict what the SJC would do.  *Id.*  As explained

---

[6] For the sake of simplicity, the Court will employ "gross negligence" as shorthand for conduct that is grossly negligent, reckless, willful, or wanton.

[7] The parties agree that Massachusetts law applies.

below, the Court concludes that the SJC would not enforce agreements purporting to require

indemnification against gross negligence. *See Sharon v. City of Newton*, 437 Mass. 99, 110 n.12

(2002); *Santos v. Lumbermens Mut. Cas. Co.*, 408 Mass. 70, 80-84 (1990); *Zavras v. Capeway

Rovers Motorcycle Club,* 44 Mass. App. Ct. 17, 18-19 (1997); *see also MBTA v. CSX

Transportation, Inc.*, No. 08-1762-BLS-1 (Suffolk Sup. Ct. July 1, 2008) (concluding that an

indemnification agreement between CSX and the MBTA, covering gross negligence, was

unenforceable as a matter of public policy).[8]

 Contracts that violate public policy are unenforceable. *Feeney v. Dell Inc.*, 454 Mass.

192, 199-200 (2009). In *Zavras v. Capeway Rovers Motorcycle Club*, the Massachusetts

Appeals Court concluded that public policy precluded enforcement of contracts releasing parties

from their own gross negligence. 44 Mass. App. at 18-19. In support of its holding, the court

noted the general cautiousness in enforcing releases against liability, and cited three particular

circumstances in which courts would refuse to enforce such releases: when a release attempts to

shield a defendant for violation of a statutory duty; when a public utility attempts to limit its

liability; and when there exists and obvious disadvantage in bargaining power. *Id.* at 19. Finally,

the court invoked "persuasive authority elsewhere discouraging aggravated wrongdoing." *Id.*

(citing Prosser & Keeton, Torts § 68, at 484 (5th ed. 1984)). The SJC has not expressly endorsed

the Appeals Court's decision in *Zavras*, but it has noted the troubling implications of contractual

waivers of gross negligence liability. *Sharon*, 437 Mass. at 110 n.12 (noting that

---

 [8] In light of this conclusion, the Court need not consider CSX's argument that the facts of the underlying state-court action do not support a finding of gross negligence. Moreover, such a factual inquiry is not well-suited for summary judgment, and in any event, the Court has serious reservations as to whether it should make such a determination given that the state case is ongoing. This Court ought not circumvent the state court proceedings.

"[c]ommentators have readily distinguished the public policy implications of exculpatory releases whose only effect is relief from ordinary negligence from those intended to relieve a party from gross negligence, or reckless or intentional conduct" (citing *Zavras*, 44 Mass. App. Ct. at 17-18)).

Although the *Zavras* decision concerned an exculpatory clause, the SJC's decision in *Santos* suggests that Massachusetts courts would similarly decline to enforce agreements obligating one party to indemnify another against gross negligence. *See* 408 Mass. at 80-84. In that case, the SJC concluded that punitive damages were not recoverable pursuant to an underinsurance provision of an automobile insurance policy. *Id.* The son of Gregory and Renee Santos was killed when he was struck by a car driven by Anna Durling. *Id.* at 71. After settling with Durling's insurance company, the Santos family sought payment from its own insurance carrier, Lumbermens, pursuant to the underinsurance provisions of their automobile insurance policies. *Id.* at 71-72. Among their other arguments, the Santos family contended they were entitled to punitive damages due to Durling's gross negligence. *Id.* at 72.[9]

The SJC refused to compel Lumbermens to pay punitive damages because such an award would not be consistent with the purposes of punitive damages. *Id.* at 82-83. Punitive damages are intended to punish the wrongdoer and deter wrongdoing, and requiring Lumbermens to pay punitive damages would serve neither goal because it was not responsible for the car accident. *Id.*

---

[9] The Santos family sought punitive damages pursuant to the Massachusetts Wrongful Death Act, which provides that a person wrongfully causing the death of another shall be liable for "punitive damages in an amount of not less than five thousand dollars in such case as the decedent's death was caused by the malicious, willful, wanton or reckless conduct of the defendant or by the *gross negligence* of the defendant." Mass. Gen. L. ch. 229, § 2 (emphasis added). In the state-court action underlying the declaratory judgment case currently before this Court, the administrator of the McTague estate brought its complaint against CSX pursuant to the Wrongful Death Act.

Moreover, because Durling was not in privity of contract with Lumbermens, she would not be indirectly punished or deterred by the imposition of higher premiums. *Id.* at 82-83. Allowing the Santos family to recover punitive damages would "result [only] in payment of punitive damages by a party who was not a wrongdoer." *Id.* at 82.

Together, the decisions in *Zavras* and *Santos* convince the Court that the SJC would not enforce an indemnity agreement covering gross negligence. It appears that Massachusetts courts will not enforce agreements releasing defendants from their own gross negligence and that is in effect what the indemnification agreement here would do. Although CSX would still be liable in a technical sense, it would be saved from the true consequences of its gross negligence because the MBTA, rather than CSX, would be responsible for paying damages.

Moreover, enforcing the indemnification agreement would undercut the purposes of the Wrongful Death Act, under which the administrator of the McTague estate sued CSX. The Act, as noted, provides for punitive damages where "the decedent's death was caused by the malicious, willful, wanton or reckless conduct of the defendant or by the *gross negligence* of the defendant." Mass. Gen. L. ch. 229, § 2 (emphasis added). The goals of deterrence and punishment would be frustrated if a defendant used an indemnification agreement to shift the costs of its own gross negligence. *Cf. Santos*, 408 Mass. at 82-83.[10]

CSX offers a number of responses. First, it contends that the TRA is consistent with the Massachusetts policy of providing some form of recovery to plaintiffs. *See Zavras*, 44 Mass. App. Ct. at 19. Whereas a release of liability would deprive the McTague estate of any relief,

---

[10] The Wrongful Death Act, of course, is also intended to compensate plaintiffs. *Santos*, 408 Mass. at 82. This goal is served even in the presence of an indemnification agreement because the plaintiff will still receive compensation, albeit not from the wrongdoer. *See id.*

enforcing the indemnification agreement as written would not leave the McTague estate without recourse.  Rather, the estate would still recover compensatory (and possibly punitive) damages, depending on the outcome of the state-court action; the only difference is that the MBTA would be writing the check rather than CSX.  (Pl. Mem. at 21-22).  This argument is correct, as far as it goes.  But, as described above, Massachusetts law—and the Wrongful Death Act in particular—are not focused solely on the plaintiff.  Massachusetts public policy seeks also to deter and punish grossly negligent conduct—goals that would be subverted by enforcing the indemnification agreement in the manner requested by CSX.[11]

Second, CSX argues that the TRA in fact deters it from engaging in grossly negligent conduct.  *See Braley v. Berkshire Mut. Ins. Co.*, 440 A.2d 359, 363 (Me. 1982).  Specifically, CSX contends that "[c]ontractual indemnification for conduct that includes both negligence and recklessness itself incorporates a deterrent effect through the implementation of higher premiums or more onerous contract terms."  (Pl. Mem. at 26).  The Court is not convinced.  The possibility that the MBTA or another party might exact additional concessions from CSX in exchange for including similar indemnification clauses in future agreements is a far cry from the direct deterrent effect of CSX being held liable for its own gross negligence and being required to pay punitive damages.  *Cf. Santos*, 408 Mass. at 82-83.

Finally, CSX contends that, unlike the parties in *Zavras*, it and the MBTA are

---

[11] CSX cites, and the Court acknowledges, that other jurisdictions will enforce indemnity agreements covering grossly negligent conduct.  (Def. Mem. 22-23 & n.17 (citing, among others, *First New Jersey National Bank v. Dome Petroleum Ltd.*, 723 F.2d 335, 341-42 (3d Cir. 1983); *Austro v. Niagara Mohawk Power Corp.*, 487 N.E.2d 267, 267 (N.Y. 1985))).  The Court's role in this case, however, is to predict Massachusetts law, and for the reasons discussed, the Court concludes that Massachusetts courts would decline to enforce the indemnity provisions of the agreement between CSX and the MBTA to the extent they cover grossly negligent conduct.  *See also MBTA v. CSX Transportation, Inc.*, No. 08-1762-BLS-1 (Suffolk Sup. Ct. July 1, 2008).

sophisticated parties that freely bargained for and entered into the TRA, expecting it to be enforced. (Pl. Mem. at 26). Again, the Court is not persuaded. While courts applying contract law unquestionably strive to effectuate the expectations of the parties, *see, e.g., Whittle v. Pagani Bros. Construction Co.*, 383 Mass. 796, 781 (1981), that principle cannot save the indemnification agreement here. Even sophisticated parties cannot contract around public policy. *See Bureau of Special Investigations v. Coalition of Public Safety*, 430 Mass 601, 602 (2000). Accordingly, the Court concludes that the indemnification provisions of the TRA are unenforceable under Massachusetts law to the extent they obligate the MBTA to indemnify CSX against grossly negligent, reckless, willful, or wanton conduct.[12]

### F.   Preemption

The Court must next decide whether federal law preempts Massachusetts public policy insofar as a Massachusetts court would not enforce the MBTA's obligation to indemnify CSX against liability arising from grossly negligent conduct.

The Supremacy Clause provides that the "Constitution, and the laws of the United States which shall be made in pursuance thereof . . . shall be the supreme law of the land, anything in the Constitution or laws of any State to the contrary notwithstanding." U.S. CONST. art. VI, cl. 2. Accordingly, courts have long recognized that federal law preempts contrary state enactments.

---

[12] The MBTA does not contend that the public policy of Massachusetts obviates its duty to defend CSX in the underlying state-court action even to the extent that lawsuit contains allegations of grossly negligent conduct. *Cf. Simplex Techs.*, 429 Mass. at 199 ("That some, or even many, of the underlying claims may fall outside the coverage does not excuse Liberty Mutual from its duty to defend these actions."). Compelling the MBTA to defend CSX would not offend Massachusetts public policy, because it would not mean that CSX was released from the consequences of its allegedly grossly negligent conduct, nor would it frustrate the purposes of punitive damages and the Massachusetts Wrongful Death Act. CSX, the alleged wrongdoer, would still be liable for its own actions and would therefore be deterred and punished. In any event, because the MBTA has waived any contention that its duty to defend (as opposed to its duty to indemnify) is limited to simple negligence, the Court concludes that the MBTA has a duty to defend CSX in the underlying lawsuit irrespective of the nature of the conduct alleged.

Preemption comes in three forms:  express preemption, field preemption, and conflict preemption.

In this case, only conflict preemption is at issue.[13]   Conflict preemption occurs when compliance with both federal and state law is a physical impossibility or when the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.  *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 152-53 (1982).  In deciding whether a state law or public policy is preempted, the touchstone of the inquiry is congressional intent.  *See O & G Indus., Inc., v. Nat'l R.R. Passenger Corp.*, 537 F.3d. 153, 160 (2d Cir. 2008).

CSX argues that the Amtrak Reform and Accountability Act of 1997 (the "Reform Act"), 49 U.S.C. § 28103(b), authorizes providers of rail passenger service—that is, entities such as the MBTA—to enter into indemnification agreements like those at issue in this case.  (Pl. Reply Mem. at 1-17).  In so doing, CSX contends, Congress has made clear its intent to preempt state laws that purport to nullify or limit indemnification agreements authorized by federal law.  (*Id.* at 3-9).  In response, the MBTA contends that the Reform Act does not have the preemptive scope ascribed to it by CSX.  (Def. Opp. at 6-14).  According to the MBTA, Congress at most intended to preempt state laws that nullified indemnification agreements, but not those laws that merely limited the scope of such agreements.  (*Id.* at 10).

In relevant part, the Reform Act provides:  "A provider of rail passenger transportation may enter into contracts that allocate financial responsibility for claims."  49 U.S.C. § 28103(b).

---

[13] CSX does not contend that federal law expressly preempts Massachusetts public policy, nor does it argue that Congress has regulated the entire field.

The language of § 28103(b) is clear and unambiguous. It authorizes providers of rail passenger transportation—which the MBTA unquestionably is—to enter into contracts allocating financial responsibility for claims.[14] At the same time, it does not purport to define the permissible content of such contracts. On its face, therefore, § 28103(b) authorizes the MBTA and CSX to enter into the TRA, but it does not deny Massachusetts the power to limit the agreement's scope.

The structure of § 28103 supports this interpretation. For example, subsection (a)(1) provides for express preemption in certain situations while subsection (b) does not. In relevant part, subsection (a)(1) provides:

> *Notwithstanding any other statutory or common law or public policy*, or the nature of the conduct giving rise to damages or liability, . . . punitive damages . . . may be awarded [in certain defined cases]. . .only if the plaintiff establishes by clear and convincing evidence that [defendant acted] with a conscious, flagrant indifference to the rights or safety of others.

49 U.S.C. § 28103(a)(1) (emphasis added). Subsection (b), by contrast, does not contain such strong language, but merely provides that rail carriers "may" enter into indemnification agreements. *See also Jenkins v. Nat'l R.R. Passenger Corp.*, 2008 WL 68685, at *15 (N.D. Ill. Jan. 3, 2008) (highlighting some of the expressly preemptive provisions of the Reform Act). The fact that Congress deliberately used less sweeping language in subsection (b) is strong evidence of its narrower reach.

That contrast is not, by itself, conclusive of the implied preemption inquiry, for the presence of an express preemption provision does not automatically preclude the possibility of implied conflict preemption. *Deweese v. Nat'l R.R. Passenger Corp.*, 590 F.3d 239, 249 (3d Cir.

---

[14] The Reform Act defines "claims" as those made "against Amtrak, any high-speed railroad authority or operator, any commuter authority or operator, any rail carrier, or any State." 49 U.S.C. § 28103(e)(1)(A).

2009) ("[T]he expression of preemption in one subsection does not mean that preemption was not intended by the language of another subsection on another topic."); *see also Chamber of Commerce v. Edmondson*, 594 F.3d 742, 766 n.26 (10th Cir. 2010).  But in determining whether implied preemption exists, the Court's goal is always to effectuate the intent of Congress.  *Altria Group, Inc. v. Good*, 129 S. Ct. 538, 543 (2008).  When Congress uses expressly preemptive language in one section, but employs weaker language in another, that is at least some evidence of what Congress intended to do.  *See Good v. Altria Group, Inc.*, 501 F.3d 29, 48-49 (1st Cir. 2007), *aff'd*, 129 S. Ct. 538 (2008); *cf. Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 517 (1992) ("When Congress has considered the issue of pre-emption and has included in the enacted legislation a provision explicitly addressing that issue, *and when that provision provides a reliable indicium of congressional intent with respect to state authority*, there is no need to infer congressional intent to pre-empt state laws from the substantive provisions of the legislation." (quotations omitted) (emphasis added)).  The structure of the Reform Act therefore confirms the plain meaning of § 28103(b):  Indemnification agreements between rail carriers are enforceable, but not free of all state regulation.

It follows from this interpretation that invalidating the gross negligence provision of the indemnity agreement does not conflict with the unambiguous language of the Reform Act.  *See Good*, 501 F.3d at 27 (articulating conflict preemption standard).  On the contrary, declining to enforce the gross negligence indemnification requirement of the TRA is consistent with the language of § 28103(b).  Under Massachusetts law, the MBTA and CSX are permitted to "enter into [a] contract that allocate[s] financial responsibility for claims."  49 U.S.C. § 28103(b).  At the same time, Massachusetts public policy, as determined by this Court, limits the scope of any such

contract.  But it does not deprive the MBTA or CSX of the right to enter into it.  Because Massachusetts public policy can be reconciled with the plain language of § 28103(b), there is no conflict.

The legislative history of the Reform Act confirms this interpretation, and further demonstrates that enforcing Massachusetts public policy does not stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.  Congress enacted the Reform Act against the backdrop of the decision by the United States District Court for the District of Columbia in *National Railroad Passenger Corp. v. Consolidated Rail Corp.*, 698 F. Supp. 951, 972 (D.D.C. 1988).  *See* H.R. Rep. No. 150-251, at 34 (1997).  That decision resulted from a violent collision between an Amtrak train and three Conrail freight locomotives in Chase, Maryland, in which 16 people died and more than 350 people were injured.  698 F. Supp. at 952. At the time of the accident, Amtrak and Conrail were parties to an freight operating agreement that purported to require Amtrak to indemnify Conrail against the wrongful acts of Conrail or its employees, regardless of the level of fault.  *Id.* at 954.  Amtrak thereafter filed a declaratory judgment action seeking a declaration that the indemnification agreement was void as against public policy in cases of gross negligence.  *Id.* at 953.  The court agreed with Amtrak and set aside the operating agreement to the extent it would have obligated Amtrak to indemnify Conrail for grossly negligent conduct.  *Id.* at 970-72.

It is clear from the legislative history that, *as it was initially proposed*, Congress intended the Reform Act to overturn the *National Passenger Corporation* decision.  H.R. Rep. No. 150-251, at 34; *see* S. Rep. No. 105-85, at 5, 14-15 (1997).  When the House Committee on Transportation and Infrastructure reported the Amtrak Reform and Privatization Act of 1997, a

predecessor to the Reform Act, it declared that it was "overruling the *National Passenger Corporation* case in order to restore indemnitees' confidence in the enforceability of their indemnification agreements."  H.R. Rep. No. 150-251, at 34.  While not directly referencing the decision, the report of the Senate Committee on Commerce, Science, and Transportation stated:

> [T]his bill clarifies that indemnification agreements related to the provision of rail passenger service entered into by Amtrak and other parties would be enforceable. . . . Amtrak and the freight railroads believe legislation is necessary to confirm enforceability of the indemnification agreements they have entered into regarding operation over each other's rail lines, *notwithstanding allegations of gross negligence by a freight railroad or Amtrak.*

S. Rep. No. 105-85, at 5 (emphasis added).

In line with that stated intent, the House and Senate committees initially reported bills that contained clear language preempting state laws or public policies that would have nullified or limited indemnification agreements entered into by Amtrak and other parties.  Both the House and Senate bills provided:

> Indemnification Obligations.—Obligations of any party, however arising, including obligations arising under leases or contracts or pursuant to orders of an administrative agency, to indemnify against damages or liability for personal injury, death, or damage to property . . ., shall be enforceable, *notwithstanding any other statutory or common law or public policy, or the nature of the conduct giving rise to the damages or liability.*

Amtrak Reform and Privatization Act of 1997, H.R. 2247, 105th Cong. § 28103(b) (1st Sess. 1997) (as reported by the House Committee on Transportation and Infrastructure on Sept. 17, 1997) (emphasis added); Amtrak Reform and Accountability Act of 1997, S. 738, 105th Cong. § 28103(b) (1st Sess. 1997) (as reported by the Senate Committee on Commerce, Science, and Transportation on Sept. 24, 1997) (emphasis added).  Thus, as reported out of committee, the

Reform Act would have guaranteed the enforceability of the TRA, notwithstanding the

Massachusetts public policy that precludes indemnification agreements depending on "the nature

of the conduct giving rise to the damages or liability"—that is, agreements covering gross

negligence.

    As ultimately enacted, however, the Reform Act did *not* contain that preemptive language.

To the contrary, the statute as enacted provides simply that "[a] provider of rail passenger

transportation may enter into contracts that allocate financial responsibility for claims."  49

U.S.C. § 28103(b).  Thus, while § 28103(b) as originally considered might have precluded most if

not all state regulation of indemnity agreements between rail carriers, the Reform Act as passed is

not so broad.[15]  Section 28103(b) simply does not have the preemptive sweep ascribed to it by

CSX.

    Nevertheless, CSX relies on two recent circuit court decisions to bolster its preemption

argument.  Neither, however, lends the necessary support, and both are distinguishable.  In *O & G*

*Industries, Inc., v. National Railroad Passenger Corp.*, the Second Circuit concluded that the

Reform Act preempted a Connecticut statute that prohibited, "on public policy grounds,

indemnity agreements entered into in connection with construction contracts, if they purport to

shield the indemnitee from liability for its own negligence."  537 F.3d at 156.  The indemnity

agreement at issue in that case required O & G to indemnify Amtrak, "irrespective of [Amtrak's]

negligence or fault."  *Id.* at 157.  The effect of applying the Connecticut statute, therefore, would

---

[15] It might be a different case if Massachusetts public policy were so restrictive as to effectively nullify the agreement between CSX and the MBTA.  In that situation, the effect of Massachusetts law might conflict with § 28103(b).  Precluding indemnification for gross negligence, however, is not so restrictive as to constitute a constructive nullification.

have been to preclude entirely the enforceability of the indemnification agreement.  *See id.* at 157,

163.  If enforced, neither O & G nor Amtrak would have been free to "enter into contracts that

allocate financial responsibility for claims."  49 U.S.C. § 28103(b).  The same cannot be said here.

Under the Court's interpretation of Massachusetts public policy and § 28103(b), the MBTA and

CSX are free to enter into an indemnification agreement, albeit subject to certain state law limits.

The Third Circuit's decision in *Deweese* is similarly distinguishable.  At issue there was a

Pennsylvania statute conferring sovereign immunity on the Southeastern Pennsylvania

Transportation Authority ("SEPTA").  590 F.3d at 242-43.  Amtrak argued, and the Third Circuit

agreed, that the Pennsylvania statute was preempted by the Reform Act.  *Id.* at 251.  Again,

however, the Pennsylvania statute, if enforced, would have invalidated the applicable

indemnification agreement in its entirety.  *Id.* at 247 ("Pennsylvania's sovereign immunity statute,

if applied as SEPTA urges, would be a *complete obstacle* to Amtrak's ability to enter into such

contracts because it would directly prevent Amtrak from being able to allocate financial

responsibility to SEPTA." (emphasis added)).  Unlike the Pennsylvania sovereign immunity

statute, the public policy of Massachusetts does not pose a "complete obstacle" to CSX's ability

to enter into an indemnification agreement.  *See id.*  Massachusetts law authorizes the TRA even

as it limits the agreement's scope.

CSX is correct that both *O & G* and *Deweese* contain broad language superficially

supportive of CSX's position.  For example, the *Deweese* court stated that "Congress intended

with the passage of the Reform Act, and, more specifically, with the passage of § 28103(b), that

all . . . indemnity agreements should be enforceable, regardless of the kind of conflicting state law

that might be erected."  *Id.* at 251 (citing *O & G*, 537 F.3d at 162).  But that statement was not

necessary to the Court's judgment, as the Pennsylvania law would have operated as a complete bar to all indemnification agreements whereas Massachusetts law merely regulates some of their content.  In any event, the Second and Third Circuits made broad pronouncements based on the House and Senate reports already discussed.  *Id.* at 247-48; *O & G*, 537 F.3d at 162-63.  As explained, this Court is of the view that those reports do not provide the necessary support for CSX's position given the significant change in language that occurred subsequent to Reform Act being reported by committee.

Accordingly, the Court concludes that 49 U.S.C. § 28103(b) does not preempt Massachusetts' policy of declining to enforce indemnification agreements covering grossly negligent, reckless, willful, or wanton conduct.

## IV.   Conclusion

For the foregoing reasons, Defendant's Motion for Partial Summary Judgment is GRANTED in part and DENIED in part, and Plaintiff's Motion for Summary Judgment is GRANTED in part and DENIED in part.  Plaintiff is entitled to judgment on Count II of the complaint, but not Counts III and IV.

**So Ordered.**

/s/ F. Dennis Saylor
F. Dennis Saylor IV
United States District Judge

Dated:  March 23, 2010