UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|   |   |   |
|---|---|---|
| CSX TRANSPORTATION, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. |
| | ) | 06-40211-FDS |
| v. | ) | |
| | ) | |
| MASSACHUSETTS BAY | ) | |
| TRANSPORTATION AUTHORITY, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER ON PLAINTIFF'S
SECOND MOTION FOR SUMMARY JUDGMENT**

**SAYLOR, J.**

This is a declaratory judgment action arising out of an indemnification agreement between plaintiff CSX Transportation, Inc., and defendant Massachusetts Bay Transportation Authority ("MBTA"). Jurisdiction is based on diversity of citizenship.

The underlying claim arises out of a tragic accident at the Wellesley Farms, Massachusetts, commuter rail station in December 2003. During a heavy snowstorm, Robert McTague was removing snow from the railroad tracks when he was struck and killed by a CSX freight train. At the time, McTague was employed by Massachusetts Bay Commuter Railroad Company, LLC ("MBCR"), which operated MBTA's commuter rail services under an operating contract.

CSX was, until recently, a defendant in a wrongful-death action brought by McTague's estate in Massachusetts state court. On cross-motions for summary judgment in March 2010, this Court determined that, under the express terms of the indemnification agreement, MBTA owed CSX a duty to indemnify and defend it in the wrongful-death action. Because, however,

Massachusetts courts would likely not enforce (as against public policy) an agreement to indemnify a party against its own gross negligence, MBTA's indemnification obligation covered only the estate's ordinary negligence claim.

Despite the ruling, MBTA did not assume defense of the state-court action. CSX ultimately settled with McTague's estate for $625,000. Before settlement, the estate stipulated to dismissal of all claims against CSX for gross negligence and for punitive damages. As a result, the entire settlement was allocated to the negligence claim, and thus allegedly subject to the indemnification obligation of MBTA.

CSX has filed a second motion for summary judgment, contending that MBTA must indemnify it for the full cost of the settlement and is estopped from challenging the allocation of settlement damages among the underlying claims. It also seeks attorney's fees and costs incurred in the defense of the state-court action and prejudgment interest. MBTA disputes the allocation of all settlement damages to the ordinary negligence claim, and has filed a brief in support of conducting a trial on the question of allocation of settlement damages.

For the following reasons, the motion for summary judgment will be granted in part and denied in part.

## I.   Background

### A.   The Agreement

MBTA is a political subdivision of the Commonwealth of Massachusetts. It is responsible for providing public transportation services in the Boston area. In 1985, Consolidated Rail Corporation ("Conrail") owned the railroad line from Boston to Worcester, which runs through Wellesley and Framingham and is used for both freight and passenger service. Conrail and MBTA

2

entered into a Trackage Rights Agreement ("TRA") governing operation of various shared railroad tracks, including the line through Wellesley. The TRA granted each party rights to provide services on property that the parties separately owned or controlled and defined their respective obligations.

Article 7 of the agreement set forth the parties' indemnity obligations with respect to accidents that occur during the provision of services required by the agreement. Section 7.03 of the TRA states in relevant part:

> MBTA shall defend, indemnify, and save harmless CONRAIL and CONRAIL Employees, irrespective of any negligence or fault of, or control by, same, or howsoever the same shall occur or be caused, from any and all liability, damage, or expense of any kind whatsoever, including reasonable attorneys fees, arising out of injury to or death of any MBTA Employee or other contractor of MBTA, or arising out of loss of, damage to, or destruction of any property of any such MBTA Employee or contractor. MBTA Employees who are involved in MBTA's provision of services to CONRAIL under this Agreement shall be regarded as MBTA Employees and not as employees of CONRAIL.

(Compl., Ex. A). Under Section 7.01, "MBTA Employees" are defined as "the employees and agents of MBTA, and MBTA's operating contractors and said contractors' employees." (*Id.*).

In June 1999, CSX purchased certain Conrail assets and became Conrail's successor-in-interest with respect to the MBTA agreement.

Since July 2003, the MBCR has provided MBTA's commuter rail services pursuant to an operating contract. MBTA has admitted that MBCR is an "operating contractor" as that term is used in Section 7.03.

### B. The McTague Accident and Ensuing Lawsuit

On December 6, 2003, Robert McTague, an employee of MBCR, was helping to clear snow from the railroad tracks at the Wellesley Farms commuter rail station during a storm. A

3

CSX freight train passed through the station, striking and killing Mr. McTague.

The tracks on which Mr. McTague were working belonged to CSX, but MBCR had not informed CSX that its crew would be clearing snow at the station. As a result, the CSX dispatcher gave a "clear signal" to the CSX train all the way from Framingham to Boston. Among other things, this meant that the train's engineer believed the tracks between Framingham and Boston would be free from any work crews.

In October 2004, the administrator of the McTague estate filed a lawsuit in Massachusetts Superior Court against CSX and MBCR for, among other things, damages for wrongful death.[1] MBTA was not named as a party in the lawsuit. CSX denied that it was negligent. Instead, it contended that Mr. McTague's death was caused by his trespassing on CSX's railroad tracks in violation of standard railroad workers' practices and the rules and regulations governing working on or around active railroad tracks. CSX also filed cross-claims against MBCR for contribution, implied indemnification, and common-law indemnification.

In November 2008, MBCR settled with the McTague estate for $750,000 and was dismissed from the case. (*See* Mot. Ex. K). One-third of the settlement was allocated to attorney's fees and costs, leaving the estate with $455,795.62. Of that amount, $355,795.62 was allocated as compensation for pecuniary loss and the remaining $100,000 was allocated as damages for pain and suffering. (*Id.*). CSX thereafter voluntarily dismissed its cross-claims against MBCR.

---

[1] The estate asserted claims against MBCR primarily under the Federal Employers' Liability Act, 45 U.S.C. §§ 51-60. Against CSX, the estate asserted claims for negligence and gross negligence under the Massachusetts Wrongful Death Act, Mass. Gen. Laws ch. 229, § 1 *et seq.* The estate sought compensatory and punitive damages.

4

## C. Federal Court Action and Ruling on Cross-Motions for Summary Judgment

CSX first sent written notice of the wrongful-death suit to MBTA in February 2005. (Mot. Ex. C). Its notice letter demanded that MBTA indemnify and defend it in the *McTague* matter. In June 2006, before commencing the federal court action, CSX again sent a written demand for indemnification and a defense. (Mot. Ex. D).

In October 2006, CSX filed a four-count complaint in this Court seeking a declaratory judgment as to its rights to indemnification and a defense from the MBTA. The complaint alleged theories of express indemnity, implied indemnity, and common-law indemnity.

The Court ruled in March 2010 on the parties' cross-motions for summary judgment. It determined that Article 7 of the TRA unambiguously imposed on MBTA a duty to indemnify and defend CSX in the state-court proceedings. The Court nevertheless agreed with MBTA that to the extent that the TRA obligated it to indemnify CSX against grossly negligent, reckless, wanton, or willful conduct, the agreement was void as against Massachusetts public policy. Because the TRA exhaustively defined MBTA's indemnification obligations, the Court declined to find an implied duty to indemnify and determined that the TRA displaced any indemnification obligation that existed under common law.

MBTA did not contend that an agreement to defend would violate Massachusetts public policy to the extent that it released a party from defending against its own gross negligence. The Court accordingly deemed any such argument waived and determined that MBTA must defend CSX in all respects in the state-court proceeding. The Court also observed that regardless of MBTA's waiver, Massachusetts courts would likely enforce an agreement to defend against grossly negligent, reckless, wanton, or willful conduct because supplying a defense neither

5

releases a party from the consequences of its gross negligence nor frustrates the objectives of punitive damages or of the Massachusetts Wrongful Death Act.

> **D.** **Events Preceding Settlement**

MBTA did not assume the defense of the wrongful-death claim after the Court issued its decision. Counsel for MBTA informed CSX that MBTA was prepared to assist in preparation for trial—which was scheduled for September 13, 2010—but indicated that it would be impractical for MBTA to take over the defense at that stage in the proceedings. (Mot. Ex. F, at 2).

In early August, counsel for the McTague estate sent CSX a demand for $5.25 million. The demand letter estimated that $3.5 million of that amount reflected compensatory damages. (Mot. Ex. G). Later the same month, CSX renewed its demand that MBTA fulfill its defense obligation. (*See id.* at 3). Counsel for MBTA responded by letter to CSX on August 27 to, among other things, decline CSX's demand and urge CSX to settle with the McTague estate. MBTA's counsel reaffirmed his willingness to assist in trial preparation, but characterized CSX's request for a complete defense at that time—shortly before trial was to begin—as "perplexing[] and dangerous." (*Id.*).

In light of the potential for a large verdict were the case to go to trial, MBTA committed, through its counsel's letter, to contribute $250,000 toward a settlement effort. (*Id.* at 4). It valued the ordinary negligence claims at no higher than $1 million. (*Id.*). Counsel for MBTA also stated, "Should [CSX] pass up an opportunity to settle the claim for a reasonable value prior to trial, and should the verdict be substantially more, the MBTA will undoubtedly take the position the indemnity is forfeited." (*Id.* at 3-4).

CSX and the estate engaged in settlement negotiations throughout August and September.

6

### E. CSX's Settlement with the McTague Estate

On September 10, 2010, the McTague estate voluntarily stipulated to dismiss with prejudice all claims that CSX's conduct was grossly negligent, reckless, wanton, or willful. (Mot. Ex. L). The estate also agreed to dismiss any claim for punitive damages under the Massachusetts Wrongful Death Act, Mass. Gen. Laws ch. 229, § 2. CSX assented to the stipulation. (*Id.*).

By letter dated September 21, MBTA's counsel informed CSX that MBTA was prepared to contribute $400,000 toward a settlement. (Mot. Ex. P, at 1). The letter indicated MBTA's understanding that, as of that date, CSX would settle with the estate for $625,000. It also stated that if MBTA's $400,000 contribution supplemented the $750,000 settlement reached with MBCR in 2008, the combined amount paid in settlement would exceed the value of the estate's compensatory claims. (*Id.*). The letter did not refer to the dismissal of the punitive damages and gross negligence claims or otherwise indicate that MBTA was aware of the dismissal.

The estate and CSX executed a settlement agreement on October 18. Under the settlement, the estate released all claims against CSX in exchange for $625,000. (Mot. Ex. M). The agreement listed the dollar amount attributable to punitive damages and to wanton, willful, or reckless conduct as "$00.00." (*Id.* at 3). It further stated:

> Both THE RELEASING PARTY and **CSX Transportation, Inc.**, do now acknowledge that none of the settlement proceeds, nor any portion thereof, represent or are attributable to punitive damages, or are for settlement and satisfaction of any claims, suits, costs, debts, demands, actions, and causes of action sounding in gross negligence, wanton, willful, or reckless conduct.

(*Id.* at 1). A provision confirmed the estate's receipt of $625,000 from CSX in satisfaction of claims "sounding in ordinary negligence." (*Id.*).

## II. Standard of Review

7

Summary judgment is appropriate when the pleadings, the discovery and disclosure materials on file, and any affidavits show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Essentially, Rule 56[] mandates the entry of summary judgment 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Coll v. PB Diagnostic Sys.*, 50 F.3d 1115, 1121 (1st Cir. 1995) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). In making this determination, the Court views "the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor." *Noonan v. Staples, Inc.*, 556 F.3d 20, 25 (1st Cir. 2009).

## III. Analysis

### A. Indemnification Obligation

CSX urges the Court to order that MBTA is responsible for reimbursement of all settlement costs. Its argument proceeds in three parts. First, it contends that MBTA breached its duty to defend when it did not assume the defense of the state-court action following the Court's March 2010 opinion. Second, it contends that because of the alleged breach of the defense obligation, MBTA is estopped from challenging any aspect of the settlement in a subsequent proceeding. Third, it contends that because settlement agreement allocated all damages to compensatory damages under the ordinary negligence claim, MBTA is responsible for the full $625,000.

MBTA responds that it could not have assumed the defense of the state-court action because a conflict of interest existed between itself and CSX. That is, because the indemnification obligation covered only claims of ordinary negligence, CSX had an incentive to retain control of

8

the defense and settle on the basis of ordinary negligence, while MBTA had an incentive to assume control of the defense and settle on the basis of gross negligence. MBTA insists that it is not bound by the stipulation of dismissal, which occurred in a case to which it was not a party and over which it exerted no control. It contends that it was, at a minimum, plausible that a factfinder would find CSX liable for gross negligence and impose punitive damages. And it contends that the Court should conduct a trial to determine whether the settlement properly allocated all damages as compensatory damages, attributable to the ordinary negligence claim.

Contrary to CSX's assertions, MBTA does not contest CSX's *decision* to settle with the McTague estate. Indeed, MBTA acknowledges that it encouraged settlement prior to trial, and in fact threatened to take the position that CSX had forfeited its right to indemnification if the case proceeded to trial and the jury rendered a large verdict for the estate. Nor does MBTA challenge the dollar value of the settlement or the overall reasonableness of a settlement in the amount of $625,000. Rather, MBTA seeks an adjudication, by a finder of fact, on the question of the reasonableness of the settlement's *allocation* of damages among the claims for ordinary negligence and gross negligence initially asserted by the McTague estate.

1. **Governing Law**

Under Massachusetts law, an "indemnitee need give the indemnitor merely 'notice and an opportunity to defend' in order to bind the indemnitor to the result of a settlement or judgment concluded in the absence of the indemnitor." *Trustees of the N.Y., New Haven & Hartford R.R. Co. v. Tileston & Hollingsworth Co.*, 345 Mass. 727, 732 (1963) (quoting *Miller v. United States Fid. & Cas. Co.*, 291 Mass. 445, 449 (1935)); *see also Fireside Motors, Inc. v. Nissan Motor Corp. in U.S.A.*, 395 Mass. 366, 371 (1985) ("[I]ndemnity may be had even though the

9

indemnitee settled the claim against him without waiting for . . . judgment obtained." (citations omitted)). This is so because once an indemnitor has declined to furnish a defense, an indemnitee should be at liberty to weigh the advantages of settlement against the risk of trial, with the certainty that a subsequent court will not disturb the outcome. *See Tileston*, 345 Mass. at 732. A corollary rule holds that a non-participating indemnitor may not, after receiving notice and an opportunity to defend, challenge in a subsequent action material facts established in the underlying case that bear on the indemnification obligation. *Miller*, 291 Mass. at 448-49; *see also Polaroid Corp. v. Travelers Indem. Co.*, 414 Mass. 747, 763 n.20 (1993).

Nevertheless, an indemnitor may assert, in a subsequent case against the indemnitee, "any matter constituting a defense and not already determined in the original action." *Miller*, 291 Mass. at 499. Put another way, even though a non-participating indemnitor is bound by the result of settlement or judgment—that is, the fact that a settlement or judgment became final—and by material facts established, it is not barred from subsequently challenging issues not determined in the original action. *See Lodge v. Bern*, 328 Mass. 42, 45 (1951); *Sweeney v. Frew*, 318 Mass. 595, 597 (1945).

### 2. **Application**

The parties do not dispute that CSX notified MBTA of the estate's claims and provided it with the opportunity to defend the action. And there is no dispute that MBTA failed to provide CSX with a defense. It appears clear, therefore, that MBTA breached its duty to defend CSX in the *McTague* matter. Even if its failure to defend CSX was in good faith—a question the Court need not address—MBTA is now estopped from contesting the result of the settlement.

*Monadnock Display Fireworks, Inc. v. Town of Andover*, 388 Mass. 153, 157 n.1 (1983); *Tileston*, 345 Mass. at 732.

This determination is of little consequence, however, because as discussed, MBTA does not contest the *result* of the settlement—that is, the fact of the settlement or its amount. CSX misapprehends MBTA's argument in this respect. Its memorandum in support of summary judgment relies heavily on *Federated Department Stores, Inc. v. J.D. Electric, Inc.*, a case that considered the "extent and existence" of the liability of an indemnitor that failed to defend its indemnitee in an underlying negligence action. *See* 1989 WL 90432, *2 (D. Mass. Jul. 31, 1989). The indemnitee settled and, in an ensuing action, sought indemnification and defense costs. The indemnitor-defendant challenged the sufficiency of the notice provided by the indemnitee and the reasonableness of the settlement. In framing the law, the court stated that the indemnitor would be permitted to litigate the reasonableness of the settlement only if the notice was deficient. *Id.* at *3.[2] It concluded that the notice supplied by the indemnitee was in fact sufficient, and accordingly held that the indemnitor was estopped from arguing that the settlement was unreasonable. *Id.* at *4.

Two points should be noted about the *Federated Department Stores* decision. First, because the injured party filed suit on one theory of liability, no conflict of interest existed between the indemnitor and indemnitee with respect to whether liability could be sustained on a ground within or beyond the scope of the indemnification agreement. For this reason, the indemnitor could not have challenged the legal basis of the settlement. Second, the indemnitor

---

[2] The court did not define with precision what it meant by the "reasonableness" of the settlement. But it is fair to infer that it referred to the reasonableness of the fact of the settlement or of the scope of the damages, as there was no dispute regarding allocation of damages among different claims.

11

did not assert a new defense or seek adjudication on a matter not determined in the original action. It merely disputed the sufficiency of the notice, leaving the court with no occasion to consider whether the it was barred from litigating an issue previously unresolved.

By contrast, the central dispute here is whether it may be taken as established that CSX was responsible to the McTague estate only for negligent conduct. CSX contends that the issue was resolved when the estate stipulated to dismissal, with prejudice, of the gross negligence and punitive damages claims. MBTA contends that it is not bound by that stipulation of dismissal and may now challenge the assignment of settlement damages exclusively to ordinary negligence claims.

The case thus poses the following question: does a stipulation between an injured party and an indemnitee to dismissal of all claims outside the scope of indemnification render the basis of liability upon settlement a "determined" or "established" fact, such that a defense-defaulting indemnitor is precluded from challenging in a subsequent action the allocation of damages exclusively to covered claims? The Supreme Judicial Court has not squarely addressed the question, but its decision in *Polaroid Corp. v. Travelers Indemnity Co.* is nonetheless instructive.

*Polaroid* concerned the calculation of damages of an insurer's breach of its duty to defend following its indemnitee's settlement with third-party claimant on uncovered claims. *See* 414 Mass. at 760-65. Polaroid's insurer contended that the third-party claims, which arose under federal anti-pollution statutes, were outside the scope of the policy and therefore declined to indemnify Polaroid or supply a defense. *Id.* at 749. After settlement, Polaroid sought indemnification and defense costs. The SJC determined that the underlying claims were not covered by the policy and no indemnification obligation existed.

12

Polaroid maintained that its insurer was nevertheless responsible for all reasonable settlement costs, regardless of whether the costs were based on covered or uncovered claims, because the insurer breached the duty to defend. *Id.* at 760. The court treated the question as an issue of contract damages, and explained that "If an underlying claim . . . is not within the coverage of an insurance policy, an insurer's improper failure to defend that claim would not ordinarily be a cause of any payment that the insured made in settlement of that claim (or to satisfy a judgment based on that claim)." *Id.* at 762-63. An insurer is therefore generally not liable for a settlement achieved on the basis of claims outside the scope of the policy. The court then observed, in a footnote:

> If any underlying case went to judgment, the insurer would be bound by the result of the trial, as to all material matters decided in that action that bear on the coverage issue. [Citations omitted]. When the underlying claim is settled, the circumstances of the underlying claim are not aired in an adversary proceeding, and, therefore, a different approach may be required.

*Id.* at 763 n.20. Thus, while declining to resolve whether "a different approach" is in fact required, the court identified an important difference between settlement of an underlying case and judgment following trial: unlike facts found by a jury or judge, facts stipulated to in anticipation of settlement are not subject to the rigor of adversarial testing.

No material facts in this case were determined by a factfinder in the state-court proceeding. The fact that the McTague estate was willing to stipulate to the dismissal of the claim for gross negligence does not resolve whether CSX's conduct was, in part, grossly negligent. That fact was never contested in an adversarial proceeding. Clearly the magnitude of negligence was a material fact of central importance; it influenced the scope of damages and it alone determined CSX's entitlement to indemnification. In the absence of factual findings on the

13

matter, the Court cannot say that it was established that all harm to McTague caused by CSX was attributable to ordinary negligence. *See Preferred Mut. Ins. Co. v. Gamache*, 42 Mass. App. Ct. 194, 201-02 (1997), *aff'd* 426 Mass. 93 (1997) (holding that an insurer breached its duty to defend the insured in an underlying tort action and was "bound by the underlying judgment," but nevertheless permitting the insurer to challenge, as outside the scope of coverage, a stipulation and settlement in the tort action that rested liability entirely on covered claims); *cf. Metropolitan Prop. & Liab. Ins. Co. v. Kirkwood*, 729 F.2d 61, 63 (1st Cir. 1984) (observing that, where a conflict of interest exists between an insurer and an insured, and where the insurer "is not a party to [a] tort suit [between the insured and a third-party], it is unlikely to be bound by the judgment" in the tort suit).

This conclusion is bolstered by the inherent conflict of interest and the potential for collusion in this context. *See Maxum Indem. Co. v. Eclipse Mfg. Co.*, 2011 WL 2415629, *11 (N.D. Ill. Jun. 13, 2011) ("A settlement that effectively lets the insured off the hook gives rise to concerns about collusion."). CSX had an interest in liability resting on ordinary negligence. Had MBTA assumed the defense of the matter, its interest would have been for liability to rest on gross negligence. The estate had an interest in maximizing the size of the settlement. Under the circumstances, the party controlling the defense would have an incentive to encourage the estate to stipulate to dismissal; if CSX, dismissal of claims for punitive damages and gross negligence, and if MBTA, dismissal of claims for ordinary negligence.[3] In a situation such as this that raises an irreconcilable divergence in the interests of indemnitor and indemnitee, it is unlikely that

---

[3] CSX recognizes the inherent conflict, noting, "had MBTA provided CSXT with a defense it would have been in no less of a conflicted position than the position into which it forced CSXT." (Br. in Opp. to Memo. Supporting Trial, at 22).

14

Massachusetts courts would deem the assignment of damages exclusively to one theory of liability as an established fact. *Cf. Kirkwood*, 729 F.2d at 63-64 (observing the general view across jurisdictions that when a conflict of interest prevents an indemnitor from supplying an initial defense, the indemnitor can relitigate the ground on which the indemnitee's liability rests); *Magoun v. Liberty Mut. Ins. Co.*, 346 Mass. 677, 684-85 (1964) (recognizing the conflict of interest between an insurer and insured where claims brought by an injured plaintiff against the insured may or may not lie within policy coverage).

The Court does not intend to suggest that collusion in fact occurred; indeed, counsel for the estate submitted an affidavit that disavowed any collusive agreement "that had the purpose of improperly affecting the MBTA's right[s]" and provided a highly plausible basis for the arrangement. (Grady Aff. ¶ 19).[4] Nevertheless, the harm posed by the potential for collusion is more worrisome than the inconvenience to the indemnitee of litigating the question of how damages should be allocated amongst claims within and beyond the scope of the indemnification obligation. This conclusion becomes more compelling in light of the *Polaroid* footnote, which anticipated the occasion for a different approach when facts that facilitate settlement are resolved without the presence of an affected party. *See Polaroid Corp.*, 414 Mass. at 763 n.20.

CSX protests that this conclusion is in error, and that Massachusetts courts have in fact already decided the issue in its favor. It analogizes to *Liquor Liability Joint Underwriting Ass'n of Massachusetts v. Hermitage Insurance Co.*, a case in which a jury rendered a verdict in the underlying action, but did not apportion damages between a claim within the scope of an

---

[4] Counsel for the estate represented that he advised his client to stipulate to dismissal of the punitive damage claims because punitive damages are taxable income under federal law, while compensatory damages are not. (Grady Aff. ¶¶ 9-15).

insurance policy and one outside the scope of coverage. 419 Mass. 316 (1995). Following the jury verdict, the parties settled for a comparable amount. The injured party prevailed on separate theories of negligence, only one of which was covered by the policy. *Id.* at 318-19. The court determined that the insurer, which breached its duty to defend at least as to one of the two claims, bore the burden of allocating the judgment damages in the underlying suit between the covered claim and the uncovered claim. *Id.* at 323-24. Because the insurer could not meet this burden, it was held liable for the entire settlement.

The court in *Hermitage* assumed that the defense-defaulting insurer could challenge the allocation of the damages between the claims. *Id.*; *accord Palermo v. Fireman's Fund Ins. Co.*, 42 Mass. App. Ct. 283, 290 (1997). But because the insurer could not peer into the jurors' minds, its burden of proving apportionment was insurmountable. *Hermitage Insurance Co.*, 419 Mass. at 324. If the analogy to the case at hand was parallel, as CSX submits, the outcome would be that MBTA may challenge the allocation of damages between ordinary and gross negligence claims, but could not, as a matter of law, meet its apportionment burden because of the stipulation to dismissal of the gross negligence claims and the attribution of "$00.00" to those claims in the settlement agreement.

The analogy is plausible, but is less apt where the allocation of liability and damages among covered and uncovered claims was not subject to adversarial testing. The jury in *Hermitage* had the opportunity to consider both theories of liability and found the insured liable under both. The subsequent dispute concerned apportionment of damages. But by stipulating to dismissal of gross negligence and punitive damages claims before trial, CSX and the estate removed MBTA's opportunity to attempt to establish that CSX's conduct was, at least in part,

16

grossly negligent.[5] Morever, the court in *Hermitage* noted that there was "no question" that the settlement was reasonable and noncollusive. *Id.* at 323. Here, MBTA has questioned the propriety of the stipulation and the reasonableness of the apportionment of settlement damages.

The Court accordingly holds that the *McTague* settlement did not determine whether CSX's conduct was merely negligent or whether it was, in part, grossly negligent. MBTA is not estopped from challenging the reasonableness of the damages apportionment exclusively to compensatory damages and the attribution of liability exclusively to the negligence claim. At trial, MBTA—the defense-defaulting indemnitor—will bear the burden of establishing that the settlement did not properly allocate damages and attribute CSX's liability based on its conduct. *See Hermitage*, 419 Mass. at 323-34; *Palermo*, 42 Mass. App. Ct. at 290.

A final matter requires consideration. Even though MBTA may challenge the allocation of settlement damages, CSX would nevertheless be entitled to summary judgment if, as a matter of law, a jury could not have found CSX's conduct grossly negligent. CSX contends that, had the case proceeded to trial, it would have been more difficult to prove gross negligence than negligence. In effect, it concedes that a gross negligence finding cannot be ruled out as a matter of law; it characterizes the gross negligence claim as the "weaker theory" and submits that the likelihood of liability based on negligence in the *McTague* matter was "far greater than" the likelihood of liability based on gross negligence. (Br. in Opp. to Memo. Supporting Trial, at 12). Moreover, MBTA has identified evidence that could have supported a verdict based at least in

---

[5] It is true that MBTA could have defended the *McTague* matter under a reservation of rights. *See Hermitage*, 419 Mass. at 323. While a cooperative defense would have been preferable and possibly avoided the present dispute, it would not have eliminated the conflict of interest.

part on gross negligence.[6] The Court therefore cannot determine as a matter of law that all liability was attributable to ordinary negligence.

The Court recognizes that holding a trial on the assignment of damages among claims for negligence and gross negligence will entail further expense and delay.[7] Nevertheless, CSX and the estate may not, by stipulation, determine a matter of material fact—central to the scope of indemnification—that subsequently binds MBTA. Summary judgment will accordingly be denied on the indemnification claim.

### B. Defense Obligation

CSX has also moved for summary judgment on the claims for costs and attorney's fees associated with the *McTague* action. An indemnitor that breaches its duty to defend is liable for the reasonable expenses associated with defending the action. *Preferred Mut. Ins. Co. v. Gamache*, 426 Mass. 93, 95 (1997); *Polaroid*, 414 Mass. at 762. The Court has already determined that MBTA assumed a duty to defend CSX when it entered into the TRA, and that the

---

[6] Under Massachusetts law, "[g]ross negligence is substantially and appreciably higher in magnitude than ordinary negligence. . . . It is an act or omission respecting legal duty of an aggravated character as distinguished from a mere failure to exercise ordinary care. It is very great negligence, or the absence of slight diligence, or the want of even scant care." *Altman v. Aronson*, 231 Mass. 588, 591 (1937). A person's conduct constitutes recklessness when he "does an act or intentionally fails to do an act which it is his duty to [another person] to do, knowing . . . not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent." *Boyd v. National R.R. Passenger Corp.*, 446 Mass. 540, 546 (2006) (citations omitted).

MBTA has offered evidence (disputed by CSX) that the CSX train was speeding without its headlights on when it struck McTague; that the CSX train crew saw McTague on the tracks from 400 to 500 feet away but did not slow the train or sound the horn; and that CSX personnel were aware that MBCR work crews would be clearing snow off the tracks that evening. A reasonable jury could credit these and conclude that CSX's conduct was grossly negligent or reckless.

[7] The Court notes that the question at trial is whether, and to what extent, CSX's conduct is attributable to gross negligence and therefore falls outside the scope of the indemnification obligation. The allocation of the $625,000 settlement between compensatory and punitive damages will be the focus of the inquiry. MBCR's $750,000 settlement with the McTague estate does not factor into the inquiry.

18

duty covers claims for negligent as well as for grossly negligent, reckless, wanton, or willful conduct. As MBTA has breached its defense obligation to CSX, it follows that CSX is entitled to recover the costs and attorney's fees it reasonably expended in the state-court proceedings.

MBTA objects that it did not waive the argument that defense costs should be apportioned between claims; that waiver is disfavored against a governmental entity; and that its duty to defend should not extend to the claims for gross negligence and punitive damages. This attempt to relitigate is unconvincing. The Court has already considered the matter in its previous ruling on cross-motions for summary judgment. Because MBTA had not contended that its defense obligation was limited under Massachusetts public policy by the nature of the claim, and because Massachusetts law suggests that it is not, the Court held that MBTA's duty to defend covered the entire underlying lawsuit, regardless of the nature of the conduct alleged. That ruling stands as the law of the case, and MBTA has not convinced the Court that it was clearly erroneous and would work a manifest injustice. *See Arizona v. California*, 460 U.S. 605, 619 n.8 (1983); *Flibotte v. Pennsylvania Truck Lines, Inc.*, 131 F.3d 21, 24-25 (1st Cir. 1997).

CSX will accordingly be granted summary judgment on its claim for costs and attorney's fees to the extent that its expenses were reasonable. CSX is ordered to submit evidence, including any affidavits and relevant documents, of its defense costs within 30 days of the issuance of this order. MBTA will have an opportunity to file objections. Under Mass. Gen. Laws ch. 231, § 6C, CSX is entitled to prejudgment interest from the date at which it first tendered a demand for indemnification and a defense, or February 24, 2005.

### C. Discovery

MBTA requests that the Court order the parties to engage in discovery prior to trial. The parties have not yet exchanged discoverable materials concerning the allocation of damages between the estate's claims for negligence and gross negligence. As MBTA is unable to present facts sufficient to justify its opposition to the allocation, the parties will have 90 days from the date of this order within which to conduct discovery. *See* Fed. R. Civ. P. 56(d).

**IV. Conclusion**

For the foregoing reasons,

1. CSX's second motion for summary judgment is GRANTED in part and DENIED in part;

2. CSX shall, within 30 days of this order, submit evidence as to its reasonable attorney's fees and costs incurred in the course of defending the *McTague* matter, and MBTA will have 14 days from CSX's date of filing within which to submit objections;

3. The parties may conduct discovery from the date of this order for a period of up to 90 days, or until October 26, 2011.

**So ordered.**

                                                      /s/ F. Dennis Saylor
                                                     F. Dennis Saylor IV
Dated: July 27, 2011                            United States District Judge